UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KEIFVIN MALONE,

                Plaintiff,

          v.                                               Case No. 08-C-0570

TIM LUNDQUIST,
CINDY RITER,
and RICK RAEMISCH,

                Defendants.

ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION (DOC. # 42), AND GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DOC. # 30 AND DOC. # 45)

        Plaintiff, Keifvin Malone, an inmate at Kettle Moraine Correctional Institution, is proceeding *pro se* under 42 U.S.C. § 1983, claiming that the defendants violated his equal protection rights by keeping him in maximum custody status at Dodge Correctional Institution due to his race. On May 15, 2009, the court granted Malone a continuance of time to respond to the defendants' March 31, 2009, motion for summary judgment, and ordered the defendants to produce inmate classification summaries. The defendants produced the summaries and then renewed their motion for summary judgment on July 28, 2009. The renewed motion is now fully briefed and ready for decision.

        In addition, on July 2, 2009, Malone filed a motion asking the court to reconsider the discovery order of May 15, 2009, because the defendants were "willfully withholding" additional memos and directives that are relevant, material and critical. (Docket # 42, at 2). In support of his request, Malone attaches a Department of Corrections memo reminding staff to move inmates through the system quickly, and

directing them to establish recall dates of no more than six months for inmates less than two years from their release dates. This memo is consistent with the guideline that inmates close to their release date be considered low risk, and it does not support Malone's claim of racially biased decision making.[1]

Malone contends that the defendants "did not follow all of the policies, criteria, and directives concerning the inmate program review process and procedure." (Declaration in Support of Continuance, Docket # 40 at 3) (emphasis in original). However, he was permitted to proceed only on a claim that the defendants made recommendations regarding his security classification based upon his race. Inasmuch as Malone has had adequate discovery at this stage[2], his motion for reconsideration will be denied.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a

---

[1] By emphasizing the importance of an inmate's release date, this memo undercuts Malone's claim of racial bias. Malone identifies two Caucasian inmates who received a reduction to medium custody despite having received a major conduct report during the recall period, but both of these inmates had release dates the following year, unlike Malone, who had several years remaining to serve on his sentence.

[2] Malone was given inmate classification summaries so that he could attempt to identify similarly situated inmates who received more favorable classification recommendations due to their race. Moreover, he received a copy of the 37-page Risk Rating Instructions used for evaluating risks and classifying inmates.

2

dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, *Anderson*, 477 U.S. at 255. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id.* at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 323-24. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, it is "not required to draw every

3

conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

## II. FACTS

The plaintiff, Keifvin Malone, is a Wisconsin state inmate, who was confined at Dodge Correctional Institution (DCI) during the relevant time period. Each defendant is employed by the Wisconsin Department of Corrections (DOC). Two work at DCI: Cindy Riter as the Program Review Committee (PRC) Coordinator and Tim Lundquist as the Warden. Defendant Rick Raemisch is the Secretary of the DOC.

Program Review is a process of monitoring inmates' custody classification and placement as well as their program and treatment assignments. The purpose of Program Review is:

> (1) To provide systematic review of the inmate's needs relating to education, medical, clinical, social, offense-related and other treatment needs.
> (2) To assess the inmate's custody classification.
> (3) To assess the inmate's motivation to become involved in treatment and programs.
> (4) To secure program or treatment space as needed to permit the inmate to complete an assignment.
> (5) To provide the inmate with supplemental or alternative treatment or program assignments.
> (6) To provide a review of the inmate's adjustment, conduct and program participation.
> (7) To evaluate the inmate's risk.
> (8) To establish a date not to exceed 12 months for the next program review.
> (9) To recommend placement changes to accommodate program objectives.

Wis. Admin. Code DOC § 302.15. Riter chairs a PRC, which usually includes two other members of the DCI staff. The PRC uses a guide entitled "Risk Rating Instructions" to assist in determining inmates' custody classifications. Custody classification is determined by assessing the risk of each inmate regarding:

4

     (a) Assaultive or predatory behavior.
     (b) Escape, walk-away, and absconding occurrences.
     (c) Violation of inmate disciplinary rules under ch. DOC 303.
     (d) Disruption to the orderly processes of an institution.
     (e) Participation and progress in program or treatment.
     (f) Adjustment and history under community supervision.
     (g) Pending legal processes.

Wis. Admin. Code DOC § 302.04(2). No single factor dictates an inmate's custody classification, but the PRC emphasizes an inmate's misconduct within the institution, especially behavior that is disruptive, defiant of staff, and/or violent.

On May 1, 2008, Riter served as the Coordinator for the PRC that conducted Malone's Program Review hearing. Riter avers that race is not a factor in the PRC process, that she has never made a recommendation regarding an inmate's PRC review based on the inmate's race, and is not aware of any other PRC member who has done so. The PRC was unanimous in its recommendation that Malone remain in maximum custody status, based upon the assaultive and violent nature of his criminal history, as well as his recent and disruptive misconduct in the institution.

Malone was serving a revocation sentence for Armed Robbery and First Degree Reckless Injury, Use of a Dangerous Weapon, for an incident in which he and two accomplices went to a residence to rob the occupants at gunpoint. During the robbery he discharged a firearm and one of the victims suffered multiple gunshot wounds.[3] Malone was revoked for a subsequent gun-related violation, and his juvenile history included another Armed Robbery in which the victim was robbed at gunpoint, as well as three separate "AWOL" or "escape" incidents. September 13, 2012, was his release date.

---

[3] It is not clear from the record whether Malone shot the victim, or whether the victim was shot by someone else during the course of the robbery.

5

The PRC found Malone's institutional adjustment unacceptable, due to a major conduct report for disruptive conduct and failure to attend work/school in November 2007, as well as two minor conduct reports in January and April 2008. Consequently, the PRC recommended that Malone stay in maximum custody status, pending a six-month recall to consider a possible reduction to medium custody if he could refrain from further conduct difficulties and receive no additional conduct reports.

On May 16, 2008, Malone filed an inmate complaint alleging that Riter gave preferential treatment to Caucasian inmates compared to African-American inmates. The Inmate Complaint Examiner recommended dismissal for failure to allege sufficient facts beyond Malone's opinion, and Lundquist accordingly dismissed the complaint. Malone appealed the dismissal. On June 6, 2008, the Office of the Secretary dismissed the complaint, by the signature of Amy Smith.

Secretary Raemisch had no personal involvement with Malone or his claims until he was served with process in this lawsuit. Lundquist's involvement with Malone's PRC proceeding was limited to his dismissal of Malone's inmate complaint alleging that Riter gave preferential treatment to inmates based on their race.

## III. ANALYSIS

In support of summary judgment, the defendants offer that Raemisch and Lundquist are entitled to summary judgment because they had no personal involvement in Malone's PRC proceedings, and that Riter is entitled to summary judgment because Malone did not suffer racial discrimination regarding his PRC recommendation.

In response, Malone maintains that the defendants gave favorable treatment to Caucasian inmates compared to similarly situated African-American inmates like him by

6

more frequently recommending custody reductions for the Caucasian inmates. He identifies two Caucasian inmates who displayed poor conduct but still received recommendations that their custody status be reduced from maximum to medium. Malone also asserts that his risk rating for institution conduct was low "because the risk rating time structure for disciplinary processes had passed." (Plaintiff's Brief, Doc. # 47 at 3). In addition, he identifies eight African-American inmates who had good conduct within the institution, but were denied a custody reduction based on other factors. Malone further contends that Raemisch and Lundquist failed to investigate his allegation of racial bias.

A. Personal Involvement of Raemisch and Lundquist

There is no *respondeat superior* liability in § 1983 cases; a plaintiff must establish that supervisory officials are personally responsible for the violation of the plaintiff's rights in order to recover against them. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996); *see also Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) ("public employees are responsible for their own misdeeds, but not for anyone else's"). To be responsible for constitutional torts committed by a subordinate, a government official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (internal quotation marks omitted). In this case, there is no evidence that Raemisch was aware of Malone's claims before this lawsuit was filed. Lundquist was aware that Malone believed Riter's recommendation showed racial bias, but Malone did not provide detail sufficient to require Lundquist to launch an investigation. *See Vance v. Peters*, 97 F.3d 987, 994 (7th Cir. 1996) (holding that inmate did "not supply . . . any detail to permit the conclusion that the letter sufficiently advised the warden of the situation to require her intervention"). As a result, neither

7

Raemisch nor Lundquist can be found personally responsible for any racial discrimination by Riter.

## B. Equal Protection Violation - Racial Discrimination

To assert an equal protection violation based on racial discrimination, a plaintiff "must establish that a state actor has treated him differently than persons of a different race and that the state actor did so purposefully." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). To prove this type of claim, "a plaintiff must produce evidence showing that as a racial minority he was treated differently from similarly situated Caucasian inmates and that the defendant acted with a discriminatory purpose or intent." *Hill v. Thalacker*, 399 F.Supp. 2d 925, 928 (W.D. Wis. 2005); *see also Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007) ("Discriminatory purpose can be proved with various kinds of direct and circumstantial evidence but is most often proved with evidence that similarly situated inmates were treated differently.").

Malone identifies ten Caucasian inmates whom he believes were more favorably treated despite being similarly situated to him. Six of the Caucasian inmates (L-3, N-2, R-5, V-6, V-7, and X-10) had no conduct reports during the recall period, while two of the Caucasian inmates (H-4 and N-5) had one minor conduct report. Malone identifies two of the Caucasian inmates (V-4 and X-3) as having poor conduct records. Both had one major conduct report in the recall period, as did Malone. However, unlike Malone, who also had two additional, but minor conduct reports within the recall period, neither of these inmates had a minor conduct report during the recall period.

If these two inmates were similarly situated to Malone with regard to their conduct records, they were not similarly situated with regard to their time remaining to

8

serve. When Malone's PRC hearing was conducted, he had just over four years and four months to serve on his sentence. Inmate X-3 had only thirteen months to serve, and Inmate V-4 had a release date less than a year away. Having less than 18 months to serve on a sentence is considered a "low risk" factor. (Risk Rating Instructions, Doc. # 35-2 at 15), and the PRC recommendations to reduce these inmates' custody classifications noted their approaching release dates as a factor favoring reduced custody status. (Exhibit V-4 to Malone Affidavit, Doc. # 48-2 at 33-35; Exhibit X-3, Doc. # 48-2 at 42-45). Thus, Malone fails to identify any Caucasian inmates who received more favorable recommendations, yet were similarly situated to him in terms of their conduct record and time remaining to serve.

Malone also maintains that he was a low risk in institutional adjustment despite his conduct reports. An inmate's institution adjustment risk rating is reduced to low risk five months after the inmate's release from disciplinary separation. (Risk Rating Instructions, Doc. # 35-2 at 24, 35). Accordingly, Malone's computer-generated rating in this area was reduced to low risk on April 17, 2008, two weeks before his May 1, 2008, PRC hearing. (Exhibit E to Malone Affidavit, Doc. # 48-2 at 11). However, the Risk Rating Instructions also provide that the "PRC [may] rate an inmate as High Risk for multiple minor conduct reports or other aggravating factors . . . that are not specifically defined in this section. Basis for rating must be clearly stated . . . and should normally reflect behavior demonstrated in the period of time from last to current PRC review." (Doc. # 35-2 at 23). The comments from Malone's PRC hearing of May 1, 2008, indicate that his institution adjustment was "UNACCEPTABLE," note his major conduct report for two violations on November 2, 2007, and state that his "LAST 2 CR'S WERE IN 1/08 & 4/08." (Exhibit F to

9

Malone Affidavit, Doc. # 48-2 at 13). Thus, the PRC explained adequately the recommendation to continue monitoring Malone in maximum custody until his conduct improved.

Malone does not identify any Caucasian inmates with a similar record of repeated and recent conduct reports who obtained a reduction in custody classification. Consequently, he cannot survive summary judgment, as he fails to produce any evidence that would support an inference that the PRC's recommendation regarding his custody classification was based on racial bias rather than a combination of his high risk offense and his conduct reports. *Hill*, 399 F.Supp.2d at 929 ( "Discriminatory intent may be established by showing an unequal application of a prison policy or system, but conclusory assertions of racism are insufficient."). Therefore,

**IT IS ORDERED** that the defendants' motions for summary judgment (Doc. # 30 and Doc. # 45) are GRANTED.

**IT IS FURTHER ORDERED** that the plaintiff's motion for reconsideration (Doc. # 42) is DENIED.

**IT IS FURTHER ORDERED** that this action be DISMISSED.

Dated at Milwaukee, Wisconsin, this 29th day of March, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE